IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| MICHAEL CROCKETT, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; AND PATRICK IVLOW-PAQUETTE, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED; | ) ) ) ) ) ) ) | Case No. 4:20-00417-CV-RK |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| AM NET SERVICES, INC., CROSSLINK WIRELESS, L.L.C., | ) ) ) | |
| Defendants. | ) | |

**ORDER**

Before the Court, in this action under the Fair Labor Standards Act ("FLSA"), is Plaintiffs' motion for summary judgment against all Defendants. (Doc. 80.) For the reasons below, Plaintiffs' motion for summary judgment is **GRANTED.**

I.  Background

   A.  Factual Background

Defendant AmNet Services, Inc. ("AmNet") and Defendant Crosslink Wireless, L.L.C. ("Crosslink") (collectively, "Defendants") were operationally related companies owned by a common parent company called Crosswing Holdings, LLC ("Crosswing").[1] (Doc. 81 at ¶ 1.) In addition to being owned by the same parent company, Defendants also shared the same headquarters in Fairfield, New Jersey, and were run by a common leadership team, all ultimately reporting to a single decisionmaker who held the title of either President or CEO of both companies. (*Id.* at ¶ 2.) Defendants' parent company, Crosswing, was formed as a limited liability company under the laws of the state of Delaware in April 2016. (*Id.* at ¶ 3.)

---

[1] Except where otherwise noted, these facts are taken from Plaintiffs' statement of uncontroverted material facts. As explained in § I.B below, while they did file a response to Plaintiffs' statement of uncontroverted material fact, Defendants did not meaningfully controvert any factual assertions by Plaintiffs. (*See* Doc. 86.)

Both Defendants ceased business operations on September 30, 2020. (*Id.* at ¶ 4.) While they were still operational, Defendants contracted with large telecommunications companies, such as Nokia, to provide radio frequency ("RF") design and optimization, RF engineering, drive testing, telecom, microwave, traffic engineering, switching, and other related services. (*Id.* at ¶ 5.) Crosslink typically performed services involving the physical work of "changing out antennas and other hardware," while AmNet "tested the work that was performed by Crosslink, but mostly by others." Both companies also performed other RF testing services. (*Id.* at ¶ 6.)

On August 31, 2017, Defendants' parent corporation, Crosswing, was acquired by Superior Crosslink Investments, LP ("Superior"). Superior was a limited partnership associated with a private equity group called Superior Capital Partners, L.P. ("Capital Partners"), which acquired companies "in some form of duress" at the time of acquisition, then attempted to "fix," grow, and ultimately sell those companies. (*Id.* at ¶ 7.) Prior to its acquisition by Superior, Crosswing had been owned by Rajeev Sharma and Asheesh Mahajan, who were also the founders of AmNet. (*Id.* at ¶ 8.) After Superior acquired Crosswing, Mark Carroll, an individual associated with Capital Partners, ultimately became the Interim President for both Defendants. Mr. Carroll held this position from early 2018 until September 2020 when the companies ceased operations. As the Interim President for Defendants, Mr. Carroll described his role as "keep[ing] the lights on cash management because we were under duress the entire time"; "making "decisions to keep the company afloat"; "approv[ing] new business"'; "manag[ing] head count in terms of how many people were hired and fired"; "track[ing] profitability of jobs"; and "guid[ing] sales" and operations. (*Id.* at ¶ 9.)

Prior to the August 2017 acquisition of Defendants by Superior, Defendants generally classified RF Engineers and Drive Testers as independent contractors rather than employees. After the acquisition, Mr. Carroll testified that Defendants continued to classify RF Engineers and Drive Testers as independent contractors and acknowledged that they continued to use the same Independent Contractor Agreement ("IC Agreement") forms as used by Defendants prior to Superior's acquisition. (*Id.* at ¶ 11.) Mr. Carroll testified that he does not know whether he personally reviewed (or signed on behalf of Defendants) any of Defendants' Independent Contractor Agreements with RF Engineers or Drive Testers; however, he also testified it was his understanding that even after the August 2017 acquisition, Defendants continued to use the same Independent Contractor Agreement forms that the companies had used under the prior ownership.

2

(*Id.* at ¶ 12.) Although he recalled attending a post-acquisition managers' meeting for Crosswing Holdings in mid-October 2017, Mr. Carroll did not specifically recall having any discussions among Defendants' leadership team at that time, or at any later time, regarding the propriety of the classification of the individuals in these positions as independent contractors. Rather, he testified he did not remember it being a "big issue" or recall it being "brought to the attention of, hey, this is a big deal and we need to address it, ever." (*Id.* at ¶ 13.) After the acquisition in August 2017, and during his time as Defendants' Interim President, Mr. Carroll also did not recall seeking any legal advice or opinions regarding the propriety of classifying the companies' RF Engineers and Drive Testers as independent contractors. (*Id.* at ¶ 14.)

Although Plaintiffs were each classified as independent contractors while they held RF Engineer or Drive Tester positions with Defendants, the companies classified some of their RF Engineers or Drive Testers as full-time employees rather than as independent contractors. (*Id.* at ¶ 15.) Mr. Carroll testified that he believes the distinction was largely based on whether the individual holding the RF Engineer or Drive Tester position was physically located in either New Jersey or New York, as the companies' business needs were most consistent in that geographic area. However, he admitted there may have been RF Engineers or Drive Testers in other parts of the country whom Defendants classified as full-time employees. (*Id.*) Other than their geographic location, Mr. Carroll testified he did not know what other factors the companies considered when determining whether to classify RF Engineers or Drive Testers as employees versus independent contractors. (*Id.* at ¶ 16.)

Defendants required Plaintiffs to sign written IC Agreements upon their hire and at other times throughout their employment with Defendants. (*Id.* at ¶ 17.) These IC Agreements purported to set forth the terms and conditions under which Plaintiffs would perform Drive Tester or RF Engineer services for Defendants, including the type or scope of work they would perform as well as the method and rates of compensation they would receive from Defendants for performing that work. (*Id.* at ¶ 18.) These IC Agreements included language that purportedly reflects an agreement that each RF Engineer or Drive Tester was an independent contractor and not an employee of either of the Defendants, and that he or she would be solely responsible for the withholding and payment of income and payroll taxes associated with services performed for Defendants. The IC Agreements also explicitly stated that RF Engineers and Drive Testers "must at all reasonable times be available to provide Services" to Defendants, and that they must provide

3

30 days' notice to Defendants to cancel the agreement. Plaintiffs' IC Agreements typically specified that RF Engineers would be paid a flat rate amount of somewhere between $250 and $300 per each assigned dataset they completed, and that Drive Testers would be paid between $15 and $16 for each hour of work they performed on assigned jobs as reported on their time/expense sheets.

Defendants dictated Plaintiffs' daily work assignments, hours, job site locations, and the order in which Plaintiffs performed the duties for each assigned job. For instance, Defendants specifically instructed Plaintiffs as to what work they should perform and how and when they should perform it, including the times to start traveling, when they should arrive and begin work at each location, and when they were permitted to leave each work location. Defendants also required Plaintiffs to get approval for time off, threatened to terminate their relationship if they attempted to decline a job assignment or leave a site location before Defendants informed them they could leave, and prohibited them from taking meal or restroom breaks or stopping long jobs to sleep until Plaintiffs had completed their work. (*Id.* at ¶¶ 21, 24.) Plaintiffs did not make their own schedules and had to obtain Defendants' "approval" before taking a day off or ending their shift. Defendants required Plaintiffs to submit weekly time/expense sheets for Defendants' approval, requiring Plaintiffs to list the specific hours they worked on each assigned job site or dataset, including their start and stop times for each day, their total time worked each workday, and the specific amounts of time they spent traveling to, from, and between their assigned job site locations. Plaintiffs were also expected to record on their time/expense sheets any reimbursable work-related costs they incurred during that workweek, such as mileage, parking, and toll expenses.

According to the terms of the IC Agreements, Plaintiffs were required to give at least 30 days' notice to Defendants before terminating the "agreement," yet when Plaintiff Michael Crockett tried to do so, Defendants refused to let him out of his contract. Based on the language of the IC Agreements, Plaintiffs understood that they needed to be "at all reasonable times available to provide [their] services" to Defendants and they were restricted in their ability to even attempt to perform these same type of Drive Tester or RF Engineer services directly for any of Defendants' current or past telecommunications clients or indirectly through any of Defendants' competitors. (*Id.* at ¶ 28.) Defendants regularly waited to notify Plaintiffs of their specific job assignments until the same day they were expected to go to them, effectively preventing Plaintiffs

4

from pursuing other work while they awaited their assignments from Defendants. (*Id.* at ¶ 29.) The pay Plaintiffs received from Defendants was their sole source of income, and because Plaintiffs' compensation was either based on a flat rate per dataset (no matter how many hours they worked in completing it) or just a "straight time" hourly rate for every hour Plaintiffs reported (including hours in excess of 40 in a single workweek), Plaintiffs could do little to increase their efficiency by working in a manner that would meaningfully maximize their profit or loss. (*Id.* at ¶ 30.)

Plaintiffs did not advertise their services as "independent contractors" in the telecommunications industry, nor could they, because they understood the language of the IC Agreement to prohibit them from soliciting business and providing work for "any software engineering, telecom or IT consulting or programming services" for one year after termination of the contract. The agreement also otherwise restricted their ability to contact, solicit, or provide services to Defendants' telecommunications clients. (*Id.* at ¶ 31.)

While Plaintiffs were typically required either to use their own personal vehicles or to rent vehicles when driving to perform services as RF Engineers or Drive Testers, Defendants did reimburse Plaintiffs for mileage, provided Plaintiffs with a company fuel card, and provided stipends or reimbursement for rental car costs. (*Id.* at ¶ 32.) In addition, Defendants provided Plaintiffs with the vast majority of the equipment and materials they needed to perform their jobs as RF Engineers and Drive Testers, which Mr. Carroll described as "very technical and expensive tools." Defendants also provided Plaintiffs with materials needed to perform their jobs as RF Engineers and Drive Testers such as laptops, sim cards, testing cell phones, and drive test kits, as well as e-mail addresses. When Plaintiffs needed new equipment, Defendants acquired it for them. (*Id.* at ¶ 34.) Plaintiffs were ultimately required to return the sim cards and other equipment to Defendants when they left. (*Id.* at ¶ 35.)

While RF Engineering and Driver Tester services obviously require some level of technical knowledge or experience, Plaintiffs were not required to have any specific degrees, certifications, or licenses before performing any such services for Defendants. (*Id.* at ¶ 36.) For example, Plaintiff Patrick Ivlow-Paquette had no Drive Tester experience when he started in the field and learned through hands-on experience and training in the industry. (*Id.* at ¶ 37.) Defendants provided Plaintiffs with numerous types of job-specific training, including how to perform RF Engineer or Drive Testing services, engineering software training, and other training. (*Id.* at ¶ 38.)

5

Plaintiffs Crockett and Patrick Ivlow-Paquette both worked for Defendants for a continuous period of more than three years (from approximately February 2017 until May 2020). (*Id.* at ¶ 39.) Plaintiff Mayur Patel worked for Defendants for a continuous period of approximately six months (from March 2020 until Defendants ceased operating in September 2020). (*Id.* at ¶ 40.) Slightly more than two-thirds of the unnamed Plaintiffs worked for Defendants for a continuous period of three months or longer. (*Id.* at ¶ 41.)

The RF Engineer and Drive Tester services Plaintiffs performed were done on behalf of Defendants in fulfillment of Defendants' contracts with Defendants' large telecommunications company clients; these services were essential to Defendants. (*Id.* at ¶ 42.)

Plaintiffs regularly performed more than 40 hours of work per workweek; however, they never received any compensation at an overtime premium or rate for any of this work. (*Id.* at ¶ 43.) Even without the benefit of having copies of all of their time/expense sheets, copies of their email communications with their Supervisors regarding scheduling and time worked, or any other such documents or data which might assist them in more precisely calculating the amount of unpaid overtime they believe they are owed, Plaintiffs have been able to use the sparse documents or communications they happened to retain to provide specific examples of workweeks in which they definitely worked more than 40 hours without receiving proper overtime compensation from Defendants. (*Id.*) Many of the Plaintiffs made complaints to Defendants about being misclassified as independent contractors, not receiving overtime, or not being properly paid for all time worked; however, none of these complaints resulted in the Plaintiffs receiving any overtime compensation. (*Id.* at ¶ 44.)

Some Plaintiffs also filed complaints directly with government agencies about being misclassified as independent contractors rather than as employees. (*Id.* at ¶ 45.) Although the former Director of Human Resources and Payroll for Defendant Crosslink confirmed that she received and accepted service of this lawsuit on behalf of the two named Defendants on June 29, 2020, Mr. Carroll testified that he does not know of any litigation hold or preservation notice being issued by Defendants regarding this lawsuit. (*Id.* at ¶ 46.)

Mr. Carroll testified that Defendants' efforts to preserve relevant data and documents regarding this lawsuit were limited to their belief that they had preserved the companies' data on a hard drive which he later "sent to a lawyer" who was involved with another litigation matter involving Defendants. Mr. Carroll went on to testify that the lawyer to whom he sent the hard

drive "disappeared," and Mr. Carroll and Defendants "lost access to the other hard drive" and he does not "have any more access to any papers, any more of the documents or the hard drive." (*Id.* at ¶ 47; Ex. 1, Carroll Dep. at 26:19-27:7.) Mr. Carroll further testified that the lawyer to whom he had sent the hard drive was representing Defendants' insurance carrier on a "traffic case" that was either in Kentucky or possibly in New Jersey, but that the lawyer has since "disappeared" by leaving his law firm, and the law firm cannot track him down. (*Id.* at ¶ 48.) Mr. Carroll's understanding is that this lawyer took the hard drive with him when he left his law firm, but Mr. Carroll cannot recall either the attorney's name or the name of the law firm. (*Id.*) Defendants completed a sale of all of their remaining equipment and assets around the end of October 2020, and Mr. Carroll testified that he does not know what happened to the companies' computer systems and equipment or to any filing cabinets and physical documents that may have been in Defendants' office space when Defendants vacated the premises. (*Id.* at ¶ 49.)

**B. Procedural Background**

Plaintiffs filed this putative collective action under the FLSA against Defendants Am Net and Crosslink on May 29, 2020. (Doc. 1.) A class was conditionally certified on December 4, 2020. (Doc. 23.) On November 18, 2021, Plaintiffs filed a three-count amended complaint claiming: (1) willful violation of the FLSA, 29 U.S.C. § 201, *et seq.*, including 29 U.S.C. § 207(a)(1), for failure to compensate Plaintiffs and the putative class members properly for overtime worked, (2) failure to pay earned overtime in violation of Mo. Rev. Stat. § 290.500, *et seq.*, and (3) breach of contract. (Doc. 62.)

Plaintiffs filed their motion for summary judgment on August 17, 2022. (Doc. 80.) A response to the motion was due September 7, 2022. On September 9, 2022, when no response had been filed, the Court ordered Defendants to show cause why they failed to timely respond to the motion and why the motion should not be granted as unopposed. (Doc. 82.) Defendants responded to the order to show cause and requested an extension of time to file their response. (Docs. 83, 84.) The Court found the show cause order satisfied, interpreted Defendants' motion for an extension as a motion for leave to file suggestions in response out of time, and granted Defendants leave to file their response to the motion for summary judgment on or before September 19, 2022. (Doc. 85.) On September 19, 2022, Defendants filed a response to Plaintiffs' statement of uncontroverted facts and a "motion for additional time to respond to Plaintiffs' motion for summary judgment in order to conduct necessary discovery." (Docs. 86, 87.) The Court denied

7

Defendants' motion for additional time and to reopen discovery. (Doc. 89.) Defendants have submitted no further filings regarding Plaintiffs' motion for summary judgment.

## II. Legal Standard

Whether unopposed or not, the Court applies the same standard of review applicable to all summary judgment motions. *Caranchini v. Nationstar Mortg. LLC*, No. 4:17-CV-00775-DGK, 2019 WL 418119, at *2 (W.D. Mo. Feb. 1, 2019); *see Calon v. Bank of Am., N.A.*, 915 F.3d 528, 530 (8th Cir. 2019) (in reviewing the grant of defendant's unopposed motion for summary judgment, the court "must still determine that the moving party is entitled to judgment as a matter of law on each claim") (citation and quotation marks omitted).

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). A fact is material in this context when it "might affect the outcome of the suit under the governing law," and a genuine dispute is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A moving party is 'entitled to judgment as a matter of law' if the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir. 1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)) (other citation omitted). In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Id.* (quotation marks and citation omitted). At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see* Fed. R. Civ. P. 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits

or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted).

### III. Discussion

Plaintiffs move for summary adjudication of their claims for unpaid overtime under the FLSA, arguing that: (1) Plaintiffs were, as a matter of law, employees of Defendants rather than independent contractors; (2) Defendants are liable for violating the overtime provisions of the FLSA because Plaintiffs actually performed more than 40 hours of work per workweek and Defendants did not properly compensate Plaintiffs for any overtime (at one and a half times their regular rates of pay); and (3) because Defendants willfully violated the FLSA, Plaintiffs' claims should be subject to the maximum three-year statute of limitations, and in addition, Plaintiffs should be entitled to liquidated damages because Defendants cannot show they had good faith and reasonable grounds for believing that their misclassification of Plaintiffs was in violation of the FLSA. (Doc. 80.)

#### A. Employees or Independent Contractors

In determining whether an employee-employer relationship exists, there are six guiding factors:

> (1) the degree of control exercised by the alleged employer over the business operations; (2) the relative investments of the alleged employer and employee; (3) the degree to which the employee's opportunity for profit and loss is determined by the employer; (4) the skill and initiative required in performing the job; (5) the permanency of the relationship; and (6) the degree to which the alleged employee's tasks are integral to the employer's business.

*Karnes v. Happy Trails RV Park, LLC*, 361 F. Supp. 3d 921, 928 (W.D. Mo. 2019) (citing *Karlson v. Action Process Serv. & Private Investigations, LLC*, 860 F.3d 1089, 1093 (8th Cir. 2017)).

To determine whether a person is an employee or an independent contractor, the Court must engage in a "fact-intensive" inquiry. *Schwieger v. Farm Bureau Ins. Co. of Neb.*, 207 F.3d 480, 484 (8th Cir. 2000). The "primary consideration is the hiring party's right to control the manner and means by which a task is accomplished." *Id.* However, the Court must consider "'all aspects of the working relationship.'" *Id.* at 483 (citation omitted). "While the precise nature of the working relationship – as examined by means of the factors – involves questions of fact, the 'ultimate question of [w]hether or not an individual is an "employee" within the meaning of the

9

FLSA is a legal determination rather than a factual one.'" *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022) (quoting *Karlson*, 860 F.3d at 1092-93).

### 1. Degree of Control

Here, Defendants exercised a high degree of control over Plaintiffs' work as RF Engineers and Drive Testers. In particular, Defendants dictated the Plaintiffs' daily work assignments, hours, job site locations, and the order in which Plaintiffs performed their duties for each of their assigned jobs. (Doc. 81 at ¶ 21.) Defendants also required Plaintiffs to get approval for time off, prohibited them from taking meal or restroom breaks, and did not allow Plaintiffs to stop long jobs to sleep until they had completed their work, and threatened to terminate Plaintiffs' position if they attempted to decline a job assignment or leave a sit location before Defendants informed them they could leave. Defendants provided Plaintiffs with specific instructions as to what work they should perform and how and when they should perform it, including the times they should start traveling, when they should arrive at and begin working at each location, and when they were permitted to leave each work location. (*Id.* at ¶ 22.) Plaintiffs did not make their own schedules and had to obtain Defendants' "approval" before taking a day off or ending their shift. (*Id.* at ¶ 23.) Defendants required Plaintiffs to submit detailed weekly time/expense sheets for Defendants' approval, including any reimbursable work-related costs they incurred such as mileage, parking, and toll expenses.

Further, while the terms of the IC Agreements permitted termination with 30 days' notice, Defendants refused to allow Plaintiff Crockett out of the agreement even with 30 days' notice. (*Id.* at ¶ 27.) The IC Agreements imparted that Plaintiffs needed to be "at all reasonable times available to provide [their] services" to Defendants and prohibited Plaintiffs from performing the same type of Drive Tester or RF Engineer services for Defendants' telecommunications clients or competitors. (*Id.* at ¶ 28.)

These undisputed facts show Defendants exercised a high degree of control over Plaintiffs' work, which is the primary consideration in determining the nature of the working relationship. This control is indicative of employee status.

### 2. Relative Investments

The relative investments of the alleged employer and employee also indicate employee status. In particular, while Plaintiffs were typically required either to use their own personal vehicles or to rent vehicles when driving to perform services as RF Engineers or Drive Testers,

Defendants offset these costs for Plaintiffs by reimbursing them for various vehicle-related costs. (Doc. 81 at ¶ 32.) Defendants also provided Plaintiffs with both the "technical and expensive" equipment and materials needed to perform their jobs as RF Engineers and Drive Testers, as well as things like laptops, sim cards, testing cell phones, drive test kits, and email addresses. (*Id.* at ¶ 33.) When Plaintiffs needed new equipment, Defendants acquired it for them. (*Id.* at ¶ 34.) Plaintiffs were expected to return to Defendants' materials or equipment like the sim cards (*Id.* at ¶ 35.) Defendants also provided Plaintiffs with many types of job-specific training, including how to perform RF Engineer or Drive Testing services, engineering software training, and other training. (*Id.* at ¶ 38.)

The undisputed facts indicate Defendants' relative investment was much greater than that of Plaintiffs, which weighs in favor of employee status.

### 3. Opportunity for Profit and Loss

As to this prong, the Eighth Circuit has explained:

> Under this factor, courts generally consider whether workers had control over profits and losses depending on their managerial skill. A worker exercising managerial skills such as setting his own hours and rates along with the ability for the worker to earn additional income through his own initiatives indicate control over profits and losses. In other words, facts demonstrating that a worker can use his managerial skill to improve his efficiency such that he can complete more jobs weigh in favor of independent contractor status.

*Walsh*, 39 F.4th at 1084 (cleaned up).

Here, the IC Agreements typically specified that RF Engineers would be paid a flat rate amount of somewhere between $250 and $300 per each assigned dataset they completed and that Drive Testers would be paid a rate between $15 and $16 for each hour they worked on assigned jobs and reported on their Time/Expense sheets. (*Id.* at ¶ 20.) Thus, regarding pay, Plaintiffs could do little to increase their efficiency by working in a manner that would meaningfully maximize their profit or minimize their loss. In addition, Defendants' control over Plaintiffs' work, as detailed above, also indicates Plaintiffs' lack of control over profits and losses as tied to any managerial skill on Plaintiffs' part. (*Id.* at ¶¶ 21-28.)

These undisputed facts show Plaintiffs' lack of opportunity for profit and loss depending on their managerial skill, indicating employee status.

11

4. **Skill and Initiative Required to Perform Job**

While RF Engineering and Driver Tester services obviously require some level of technical knowledge or experience, Plaintiffs were not required to have any specific degrees, certifications or licenses before performing any such services for Defendants. (Doc. 81 at ¶ 36.) For example, Plaintiff Ivlow-Paquette had no Drive Tester experience when he started in the field, learning through hands-on experience and training in the industry. (*Id.* at ¶ 37.) Defendants provided Plaintiffs with many types of job-specific training, including how to perform RF Engineer or Drive Testing services, engineering software training, and other types of training. (*Id.* at ¶ 38.)

This factor favors a finding of employee status.

5. **Permanency of Relationship**

A long-standing relationship between the parties indicates employee status. *Schwieger v. Farm Bureau Ins. Co. of NE*, 207 F.3d 480, 485 (8th Cir. 2000). Here, Plaintiffs Crockett and Ivlow-Paquette both worked for Defendants for a continuous period of more than three years (from approximately February 2017 until May 2020). (Doc. 81 at ¶ 39.) Plaintiff Patel worked for Defendants for a continuous period of approximately six months (from March 2020 until Defendants ceased operating in September 2020). (*Id.* at ¶ 40.) Slightly more than two-thirds of the Plaintiffs worked for Defendants for a continuous period of three months or longer. (*Id.* at ¶ 41.) In addition, Defendants did not always allow Plaintiffs to terminate the IC Agreement even with the requisite 30-days' notice.

In view of these undisputed facts, the longer-term nature of the parties' relationship here indicates employee status.

6. **Tasks Integral to Business**

The factor regarding the degree to which the alleged employee's tasks are integral to the business "turns on whether workers' services are a necessary component of the business." *Walsh*, 39 F.4th at 1085 (internal quotation omitted).

Here, while Defendants' businesses were still operational, Defendants contracted with large telecommunications companies, such as Nokia, to provide RF design and optimization, RF engineering, drive testing, telecom, microwave, traffic engineering, switching, and other related services. (Doc. 81 at ¶ 5.) The RF Engineer and Drive Tester services that Plaintiffs performed were done on behalf of Defendants in fulfillment of Defendants' contracts with Defendants' large telecommunications company clients; thus, these services were essential to Defendants. (*Id.* at ¶

12

42.) Defendants classified some of their RF Engineers or Drive Testers other than the Plaintiffs in this lawsuit as full-time employees rather than as independent contractors. (*Id.* at 15.)

These undisputed facts show the work performed by Plaintiffs was a part of the regular business of the Defendants, and, therefore, this factor weighs in favor of employee status.

**B.     Violation of FLSA – Failure to Properly Compensate Overtime**

"If an employer has failed to keep records, employees are not denied recovery under the FLSA simply because they cannot prove the precise extent of their uncompensated work." *Holaway v. Stratasys, Inc.*, 771 F.3d 1057, 1059 (8th Cir. 2014). In contrast, "employees are to be awarded compensation based on the most accurate basis possible." *Id.* (internal quotation omitted). Under this standard, "once the employee has shown work performed for which the employee was not compensated, and sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference, the burden then shifts to the employer to produce evidence to dispute the reasonableness of the inference." *Id.* (internal quotation omitted).

The Court acknowledges the lack of documentary support for Plaintiffs claims of regularly performing more than 40 hours of work per workweek. The Court finds, however, Plaintiffs' attestations are sufficient. Despite receiving notice of this lawsuit, Defendants failed to preserve relevant data and documents, including Defendants' inability to locate a lawyer to whom Mr. Carroll sent a hard drive containing company data and the apparent liquidation of Defendants' equipment and assets.

Under the unusual circumstances in this case, Plaintiffs have shown they are entitled to summary judgment that they performed work for which they were not properly compensated for purposes of demonstrating Defendants' liability for unpaid overtime under the FLSA.

**C.     Willfulness**

Plaintiffs lastly seek summary judgment, arguing (1) Defendants willfully violated the FLSA (and therefore § 255's three-year statute of limitations applies to their claims), and (2) Defendants did not act in good faith with reasonable grounds for believing they complied with the FLSA and therefore Plaintiffs are entitled to liquidated damages. (Doc. 81 at 21.)

Title 29 U.S.C. § 216(b) provides for liquidated damages where an employer violates the FLSA. Section 260, however, gives the court discretion to award no liquidated damages where "the employer shows to the satisfaction of the court that the act or omission giving rise to such

13

action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act[.]"

After Superior acquired Crosswing, Mr. Carroll became the Interim President for both Defendants and held this position from early 2018 until the companies ceased operations at the end of September 2020. In that position, Mr. Carroll was responsible for everything that occurred with the Defendants.

Although Defendants' decision to classify RF Engineers and Drive Testers as independent contractors rather than as employees was initially made prior to Superior's August 2017 acquisition of Defendants, even after the acquisition, Defendants continued to classify at least some RF Engineers and Drive Testers as independent contractors rather than employees, including using the same IC Agreements as used prior to the acquisition. Mr. Carroll, as Interim President, was aware that some RF Engineers and Drive Testers were classified as full-time employees rather than independent contractors. Mr. Carroll did not know what factors – other than potentially a geographic location – were potentially considered in determining whether to classify RF Engineers or Drive Testers as employees versus independent contractors and he does not recall seeking any legal advice or opinions regarding Defendants' classifications of these jobs.

In light of these undisputed facts and the summary judgment record, the Court is not satisfied that the acts or omissions giving rise to this case were made in good faith or that Defendants had reasonable grounds for believing their acts or omissions in failing to pay Plaintiffs overtime was not a violation of the FLSA.

## IV. Conclusion

Accordingly, and after careful consideration, Plaintiffs' motion for summary judgment (Doc. 80) is **GRANTED.**

**IT IS SO ORDERED.**

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: December 20, 2022